IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN KOWAL, | ) | Case No. 3:18-cv-181 |
| | ) | |
| Plaintiff, | ) | JUDGE KIM R. GIBSON |
| | ) | |
| v. | ) | |
| | ) | |
| FERNDALE AREA SCHOOL DISTRICT | ) | |
| and FERNDALE AREA SCHOOL | ) | |
| DISTRICT BOARD OF EDUCATION, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### I.    Introduction

This case arises from Defendants Ferndale Area School District ("School District") and Ferndale Area School District Board of Education's ("School Board" or "Board") (collectively "Ferndale" or "Defendants") alleged acts of retaliation against Plaintiff John Kowal ("Kowal") in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.*  Pending before the Court is Defendants' Motion for Summary Judgment. (ECF No. 45).  The Motion is fully briefed (ECF Nos. 47, 55) and ripe for disposition.  For the reasons that follow, the Court **GRANTS** Defendants' Motion for Summary Judgment.

### II.    Jurisdiction and Venue

This Court has subject-matter jurisdiction because Plaintiff's ADEA claim arises under federal law.  28 U.S.C. § 1331.  The Court has supplemental jurisdiction over Plaintiff's PHRA

claim because it forms part of the same case or controversy as his ADEA claim. 28 U.S.C. § 1367. Venue is proper because a substantial portion of the events giving rise to Plaintiff's claims occurred in the Western District of Pennsylvania. 28 U.S.C. § 1391.

### III.   Factual Background

The following facts are undisputed unless otherwise noted.[1]

#### A.  Introduction

Mr. John Kowal was employed as a business manager by Ferndale from 1987 until his retirement on September 12, 2017. (ECF No. 46 at ¶¶ 1-2).  As a business manager, Kowal was responsible for all financial aspects of the School District including financial reporting, accounting, payroll, accounts payable, insurance (including health insurance), all components of the Administrator/Supervisor Compensation package, and retirement benefits. (*Id.* at ¶¶ 3-4).

#### B.  Sick Leave Incentive Upon Retirement

While employed by Ferndale, Kowal received contractual benefits tied to an Act 93 Agreement. (*Id.* at ¶¶ 6-9; ECF No. 46-2 at Exhibits D-6, D-7).  During the relevant time period in this case, Kowal's Act 93 Agreement permitted Act 93-covered individuals to apply unused accumulated sick days towards health care coverage in retirement through a program called the Sick Leave Upon Retirement Incentive ("Sick Leave Incentive Program"). (ECF Nos. 46 at ¶ 15; 59 at ¶ 15; 46-2 at Exhibit D-6).  To be eligible to participate in the Sick Leave Incentive Program,

---

[1] The Court derives these facts from a combination of Defendants' Concise Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment (ECF No. 46), Plaintiff's Response to Concise Statement of Undisputed Material Facts in Opposition to Defendant's Motion for Summary Judgment (ECF No. 59), Defendants' Reply to Plaintiff's Response to Concise Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment (ECF No. 60), and Plaintiff's Second Amended Complaint (ECF No. 26).

an Act 93-covered individual was required to meet several criteria.[2] (ECF No. 46-2 at Exhibit D-6).  If an employee was qualified to participate in the Sick Leave Incentive Program by meeting the criteria listed within the Act 93 Agreement, the employee was then permitted to choose one of several options when applying their unused accumulated sick days towards their health care coverage in retirement.[3] (Id.).

---

[2] In its entirety, the Sick Leave Incentive provides that "an employee shall be eligible for 'Sick Leave Incentive Upon Retirement' if and only if: (i) the employee shall submit his/her resignation for purposes of retirement to the Superintendent prior to January 15 of the year in which he/she elects to retire; (ii) the retirement shall be effective subsequent to the last school day of the year and prior to August 15 of the year of retirement; (iii) the employee shall have a minimum of 15 years of service as a professional employee under the provisions of the Pennsylvania School Employees Retirement System and have attained the age of 51 as of retirement;  (iv) the employee shall have provided, as a professional employee of 'DISTRICT', at least 8 years of service; (v) the retirement shall occur before the employee attains the age of eligibility for Medicare;  (vi) the employee shall not (except for 'Restoration of Health Sabbatical' have taken a Compensated Leave at any time within the 6 fiscal years (July 1 – June 30) immediately preceding the fiscal year during which retirement occurs." (ECF No. 46-2 at D-6).

[3] The options available to qualifying employees included: "(i) 1 year of health care coverage (exclusive of Dental Insurance) as provided for in the contract in effect for the year of coverage (as of the date hereof, the coverage provided in Article IX, Section A) for the employee and his/her dependents for each 45 days of unused accumulated sick leave as of the 'effective date' of retirement, with any block of days not equal to 45 to be pro-rated to provide a portion of the coverage in the final year (i.e., 110 unused days shall result in two years of complete coverage, and 'DISTRICT' being obligated for 44% of the 3rd year premium); (ii) 1 year of health care coverage (exclusive of Dental Insurance) as provided for in the contract in effect for the year of coverage (as of the date hereof, the coverage provided in Article IX, Section A) for the employee only for each 20 days of unused accumulated sick leave as of the 'effective date' of retirement, with any block of days not equal to 20 to be pro-rated to provide a portion of the coverage in the final year (i.e. – 110 days shall result in five years of complete coverage, and 'DISTRICT' being obligated for 50% percent [sic] of the 5th year premium); (iii) 'DISTRICT' being responsible for the percentage of health care coverage premiums (exclusive of Dental Insurance) as provided for in the contract in effect for the year of coverage (as of the date hereof, the coverage provided in Article IX, Section A) for the employee until the earlier of his/her demise, attainment of age 65, or eligibility for Medicare, determined as set forth below, to a maximum 'DISTRICT' liability of $2,000 per annum.  The percentage of annual premium to be paid by the 'DISTRICT' shall be determined by dividing the number of unused accumulated sick days as of the 'effective date' of retirement by the total number of sick days earned by the employee while employed by 'DISTRICT' or its predecessors (i.e. – (200) total sick days earned while employed by Ferndale/Dale and 'District', 120 days of unused accumulated sick days as of 'effective date' of retirement, results in 60% premium payment); (iv) Payment by 'DISTRICT' to 'employee', on or before October 15 of each year, of the amount 'DISTRICT' would have been required to pay as health care coverage premium for employee had 'employee elected option (iii)'; (v) Payment by the District to employee of $115 for each sick day not used for the above." (ECF No. 46-2 at D-6).

C.  **Ferndale's Health Insurance Plan**

Ferndale is part of a self-funded consortium of school districts for healthcare, the Greater Johnstown Health Consortium ("Consortium"), with Ferndale paying its bills out of its own funds. (ECF No. 46 at ¶ 33). Ferndale employs the Reschini Group, a healthcare broker, to act as an intermediary between the Consortium and Highmark, the Consortium's insurance provider. (*Id.* at ¶ 34). As part of its healthcare coverage, the Consortium maintains a stop loss insurance policy to protect school districts from paying high claims caused by an individual incurring medical expenses that exceed a $250,000 or $300,000 threshold ("Catastrophic Claim Threshold"). (*Id.* at ¶ 52). The premium for the stop loss insurance policy is built into the premium that all ten Consortium school districts pay, and each school district pays its claims out of the School District's own funds. (*Id.* at ¶¶ 53-54). The stop loss insurance policy covers claims from active, currently employed members over the age of 65 enrolled in Ferndale's healthcare coverage. (*Id.* at ¶ 55). The stop loss insurance policy does not cover claims for inactive, currently unemployed members over the age of 65 enrolled in Ferndale's healthcare coverage.[4] (*Id.* at ¶ 56).

D.  **Kowal's Post-Retirement Healthcare Benefit Discussions with Ferndale**

At the time of his retirement on September 12, 2017, Kowal was 66 years old (*Id.* at ¶ 21), had been enrolled in Medicare for over a year (ECF No. 59 at ¶ 41), and had accumulated 353.5 unused sick days (ECF Nos. 46 at ¶ 143; 59 at ¶ 143). On September 14, 2017,[5] Kowal, Ferndale

---

[4] Kowal disputes that the stop loss insurance policy does not cover inactive members over the age of 65 who are enrolled in Ferndale's healthcare coverage. (ECF No. 59 at ¶ 56).

[5] Kowal disputes the date of the meeting held at Asiago's Restaurant in Johnstown, Pennsylvania, claiming the meeting occurred on September 20, 2017 (ECF No. 59 at ¶ 88). Although the date of the meeting is immaterial, the Court will use the September 14, 2017 meeting date provided in the Affidavit of Greg Sanford. (ECF No. 46-7 at ¶ 8).

Business Manager David Gates ("Gates"), Superintendent Carole Kakabar ("Kakabar"), and Reschini Group account executive Greg Sanford ("Sanford") met at Asiago's Restaurant in Johnstown, Pennsylvania, to discuss post-retirement healthcare coverage and Medicare. (ECF No. 46 at ¶¶ 88-91). At this meeting, Ferndale contends they informed Kowal that, consistent with the Act 93 Agreement, he was ineligible to receive Ferndale-provided post-retirement healthcare coverage because he was over 65 years old and eligible for Medicare on the date he retired. (*Id.*). Kowal contends that the Act 93 Agreement was not discussed at this meeting. (ECF No. 59 at ¶ 89). Rather, Kowal claims he was only informed of the penalties associated with late enrollment in Medicare. (*Id.*).

At a subsequent meeting, on October 31, 2017, Kowal met with Gates and Kakabar at which time he was informed that he was not eligible for the Sick Leave Incentive Program and Ferndale-provided post-retirement healthcare coverage. (ECF No. 46 at ¶¶ 92-93). During that meeting, Gates and Kakabar discussed the estimated value of Kowal's unused sick days, personal days, and vacation days and offered him $52,000 in cash for the value of his unused days. (*Id.* at ¶ 94; ECF No. 46-3 at 14:7-25; 15:1-2). Kowal, Kakabar, and Gates also discussed Kowal's separate health reimbursement account ("HRA") which was active within Ferndale's health insurance group. (ECF Nos. 46 at ¶ 97; 59-2 at Exhibit 17). Kowal, Kakabar, and Gates left the meeting without any resolution with respect to how Kowal wanted to handle his unused vacation, personal, and sick days.

Another meeting was held on November 6, 2017, between Kowal, Kakabar, Gates and Ferndale's then-Solicitor James Walsh ("Walsh") where Walsh informed Kowal that that he was not eligible for the Sick Leave Incentive Program and Ferndale-provided post-retirement

healthcare coverage. (ECF No. at ¶¶ 100-101). Walsh reviewed the Act 93 Agreement with Kowal at this meeting and asked if Kowal and his wife would submit to a health audit to determine their risk assessment towards catastrophic illness. (*Id.* ¶¶ 102-103). Kowal refused to submit to the health audit. (*Id.* ¶ 104).

Following that meeting, on November 15, 2017, the School Board held an executive session School Board meeting in which it authorized Kakabar to work towards an agreement with Kowal to provide an alternative, equivalent healthcare package in light of his years of service to Ferndale. (*Id.* ¶ 105). Kowal contends that following this School Board meeting, Kakabar called him and told him that the Board had agreed he was entitled to 7.85 years of coverage, and that she was calling to ask him his preferences for his benefit package. (ECF No. 59 at ¶ 105). Kowal indicated to Kakabar that he would like to continue with his current coverage.[6] (*Id.*). Kakabar informed Kowal that he should expect a memorandum of understanding ("MOU") confirming his request to continue with his present coverage from Walsh once she had contacted him about Kowal's healthcare coverage choice. (*Id.*).

At another School Board meeting held on December 6, 2017, the Board approved a waiver of "the Act 93 Agreement, Sick Leave Incentive Upon Retirement, for the retirement benefit of

---

[6] Ferndale contends that, prior to Kowal's retirement, he instructed payroll clerk Brenda Rhodes ("Rhodes") to process a healthcare insurance spreadsheet containing post-retirement healthcare coverage for himself and his wife through March 2025. (ECF No. 46 at ¶¶38-43). Rhodes processed the paperwork as requested and Kowal and his wife received continuing coverage from Ferndale following his retirement. (*Id.*). Ferndale also contends that Kowal knew Ferndale did not permit inactive, unemployed members over the age of 65 to be part of its Ferndale-provided healthcare coverage. (*Id.* at ¶ 48). Kowal contends that the spreadsheet he handed to Rhodes contained a list of Ferndale-provided HRA coverage, not healthcare coverage. (ECF No. 59 at ¶ 42). Regardless of the contents of the spreadsheet, both parties agree that Kowal was receiving post-retirement healthcare coverage from Ferndale after he retired on September 12, 2017. (ECF Nos. 46 at ¶ 44; 59 at ¶ 105).

John Kowal," stating that "[a]pproval is subject to Kowal accepting in writing the retirement healthcare terms offered, by December 20, 2017." (ECF No. 46-3 at Exhibit 2).   Early that next morning, on December 7, 2017, Kakabar emailed Kowal a healthcare option authorized by the School Board which would establish a Health Reimbursement Arrangement ("HRA Proposal") for Kowal and his spouse. (ECF No. 46-2 at Exhibit D-9).   In that email, Kakabar informed Kowal that she or Gates would need to be notified by Kowal, in writing, by December 20, 2017, whether he accepted the HRA Proposal offered in the email. (*Id.*).   Kakabar's email also informed Kowal that he would be removed from his "current district-provided Qualified High Deductible Healthcare Plan at day's end December 31, 2017." (*Id.*).

Kowal replied to Kakabar's email on December 11, 2017, requesting additions and/or revisions to the HRA Proposal. (*Id.* at Exhibit D-10).   Kakabar responded on December 13, 2017, indicating that changes had been made to the HRA Proposal based on Kowal's comments. (*Id.* at Exhibit D-11).   Kakabar reminded Kowal that he had until December 20, 2017, to accept the HRA Proposal and that he would be removed from his current health plan on December 31, 2017. (*Id.*). Kowal responded to Kakabar on December 15, 2017, stating he had two remaining concerns left with respect to the HRA Proposal. (ECF No. 46-12 at 2).   Kakabar responded on December 18, 2017, indicating final revisions had been made to the HRA Proposal and reminded Kowal of both the deadline of acceptance and the date he would be dropped from his health plan. (*Id.* at 3).   That same day, Kowal contacted the EEOC and filed a Charge of Discrimination against Ferndale

alleging they had violated the ADEA.[7] (ECF Nos. 26 at ¶ 28; 6-2).  Kowal dual-filed his charge

with the Pennsylvania Human Relations Commission ("PHRC"). (ECF No. 26 at ¶ 29).

On December 19, 2017, Kowal emailed Kakabar and formally requested that the December

20, 2017 deadline to accept the HRA Proposal be set aside. (ECF No. 46-13).  Kowal gave two

reasons for his request: (1) Kowal wanted to address the Board at its scheduled January 17, 2018

meeting, and (2) Kowal had an initial interview scheduled with the EEOC to determine if

Ferndale had violated the ADEA. (*Id.*).  In that same email, Kowal indicated his preference to

discuss the matter before an "open meeting" of the School Board. (*Id.*).  From December 20, 2017,

to March 2018, Kowal did not communicate any additional terms he wanted incorporated into

Ferndale's HRA Proposal, nor did he raise concerns that Ferndale had not incorporated the

changes he requested in the HRA Proposal. (ECF Nos. 46 at ¶ 141; 59 at ¶ 141).

### E. Ferndale Extends the HRA Proposal Acceptance Deadline and Continues Kowal's Healthcare Coverage into 2018

Following Kowal's requests for a deadline extension and to meet with the School Board,

Kakabar emailed Kowal on December 27, 2017, informing him that his current Ferndale-provided

healthcare plan would be extended into 2018 until Ferndale could get legal advice. (ECF No. 46-

14).  On January 16, 2018, Kakabar notified Kowal by correspondence that the deadline to accept

---

[7] Kowal alleges that he filed a Charge of Discrimination with the EEOC on December 18, 2017. (ECF No. 26 at ¶¶ 27-29).  However, other than mere assertions, Kowal has not presented any evidence that he filed his Charge of Discrimination on December 18, 2017.  The earliest record evidence produced by Kowal of his protected activity with the EEOC is dated and time-stamped February 16, 2018. (ECF No. 6-2).  Further, Kowal has not produced any record evidence of when he filed his second EEOC Complaint—which he alleges he filed on June 18, 2018 (ECF No. 26 at ¶ 43).  Ferndale accepts Kowal's assertions that he filed a Charge of Discrimination on December 18, 2017, but this Court notes that no documentation of such protected activity on December 18, 2017, has been produced. (*Id.* at ¶¶ 27-29). For the purposes of this memorandum opinion, the Court will analyze Kowal's retaliation claims as if he did engage in protected activity with the EEOC on December 18, 2017.

or reject the HRA Proposal was temporarily postponed. (ECF No. 46-3 at Exhibit 4).  In that same

correspondence, Kakabar told Kowal that his request to address the Board in "open/executive

session"[8] was declined by the School Board. (*Id.*).  Kakabar stated that "while Section 708 of the

Sunshine Law[9] would permit the Board to meet with [him], the Board [was] respectfully declining

that offer," giving several reasons to justify their decision. (*Id.*).  Specifically, Kakabar cited four

reasons the School Board was declining to meet with Kowal including: (1) Kowal had placed

himself on Ferndale's insurance without having spoken with Kakabar or Walsh before retiring,

(2) Kowal was instituting legal proceedings against Ferndale, (3) Kowal indicated he had an initial

---

[8] The Court notes that there is confusion among the parties with respect to the type of meeting Kowal requested from Ferndale when he requested an "open meeting" with the Board. (ECF No. 46-13).  In his December 19, 2017 email, Kowal requested an "open meeting" with the Board after quoting Section 708(a)(1) of the Pennsylvania Sunshine Act. (*Id.*). Ferndale appears to have interpreted Kowal's request as a demand to meet with the Board in executive session, or, at the very least, an "open/executive session." (ECF No. 46-3 at Exhibit 4). It appears to the Court that Kowal was citing Section 708 of the Pennsylvania Sunshine Act as a basis for requesting that further discussions of his retirement benefits be removed from the School Board's executive sessions and discussed only in a publicly held or "open" School Board meeting.  The Court will analyze Kowal's "open meeting" request as a request to discuss his retirement benefits in a publicly held or "open" School Board meeting.

[9] In relevant part, Section 708 of the Pennsylvania Sunshine Act states:

(a) **Purpose.--**An agency may hold an executive session for one or more of the following reasons:

(1) To discuss any matter involving the employment, appointment, termination of employment, terms and conditions of employment, evaluation of performance, promotion or disciplining of any specific prospective public officer or employee or current public officer or employee employed or appointed by the agency, or former public officer or employee, *provided, however, that the individual employees or appointees whose rights could be adversely affected may request, in writing, that the matter or matters be discussed at an open meeting.* The agency's decision to discuss such matters in executive session shall not serve to adversely affect the due process rights granted by law, including those granted by Title 2 (relating to administrative law and procedure). The provisions of this paragraph shall not apply to any meeting involving the appointment or selection of any person to fill a vacancy in any elected office. 65 Pa.C.S. § 708(a)(1) (emphasis added).

interview with the EEOC to determine if other fair employment laws had been violated, and (4) Kowal informed Ferndale it may be necessary for Ferndale to secure an attorney. (*Id.*).

A few days later, on January 19, 2018, Kakabar again notified Kowal by correspondence that he was not eligible for Ferndale-provided post-retirement healthcare coverage because he was an Act 93 covered employee. (ECF No. 46-3 at Exhibit 5). In that same correspondence, Kakabar informed Kowal that he had until February 15, 2018, to decide whether to accept the HRA Proposal. (*Id.*). If Kowal did not accept the HRA Proposal by the deadline, Kakabar stated that Ferndale would take the necessary steps to remove Kowal from Ferndale's coverage, reconcile Kowal's remaining sick days, and pay the balance out to Kowal. (*Id.*). Lastly, Kakabar stated that Ferndale was providing Kowal until February 15, 2018 to give him an opportunity to consult with counsel, or with the EEOC. (*Id.*).

On February 13, 2018, Kowal emailed Kakabar stating that he had completed the EEOC initial interview process and informed Kakabar that the EEOC would be contacting her within 10 to 60 days. (ECF No. 46-15 at 2). Kowal did not accept or respond to Ferndale's HRA Proposal by the deadline of February 15, 2018. (ECF Nos. 46 at ¶ 133; 59 at ¶ 133). On February 27, 2018, Kowal was notified by Kakabar that his healthcare coverage would be terminated on February 28, 2018 (ECF No. 46-3 at Exhibit D-2). The following day, on February 28, 2018, Kowal emailed Gates and Kakabar informing them that (1) he had completed his EEOC interview process, (2) he had completed his Charge of Discrimination Form and returned it to the EEOC and (3) consistent with EEOC advice, he had dual-filed his complaint with both the EEOC and PHRA. (ECF Nos. 46-17 at 2; 6-2). Kowal also reiterated a point made in his December 19, 2017 email to Kakabar in which he stated "'it would not be appropriate for me to jeopardize any rights I may have under

the EEOC as well as the ADEA and any other laws by making any decision, including any proposed 'payout' demands, until the EEOC had completed its investigation of his complaint." (ECF No. 46-17 at 2).   Kowal further stated he would evaluate his options after the EEOC investigation was completed. (*Id.*).

### F.   Ferndale Cashes Out Kowal's Unused Sick Days

Following the expiration of Ferndale's HRA Proposal deadline, Ferndale began the process of cashing out Kowal's unused accumulated sick days. To cover the costs of Kowal's Ferndale-provided healthcare coverage following his retirement, Kowal was charged 3.75 unused sick days per month from October 2017 to February 28, 2018 for a total of 18.75 sick days. (ECF No. 46-2 at Exhibit D-12).  In a letter dated March 5, 2018, Kakabar informed Kowal that Ferndale was paying him $38,496.25 for his remaining 334.75 unused sick days at a rate of $115 per day. (ECF No. 46-3 at Exhibit D-12).   In that same letter, Kakabar also informed Kowal that with the appropriate payroll deductions withheld, Ferndale was issuing him a check for his unused accumulated sick days totaling $22,213.71. (ECF No. 46-18).  Lastly, Kakabar notified Kowal that Ferndale had received his Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") Continuation Coverage Election Form, but Ferndale would not accept or otherwise charge 3.75 days of Kowal's unused sick days as payment for the coverage as he requested. (*Id.*).  Rather, Kowal would have to submit payment of $1,485.33 for continued "husband and wife" coverage. (*Id.*).

On March 22, 2018, Kowal sent Kakabar and Gates an email notifying them that EEOC had completed its investigation and issued a Right to Sue Letter. (ECF No. 46-19).   In that same email, Kowal informed Kakabar and Gates that he and his wife had decided to accept the Board's

HRA Proposal. (*Id.*). Kakabar responded that she would contact her legal counsel and respond to Kowal as soon as possible. (*Id.*).

A week later, on March 29, 2018, Kakabar sent an email to the School Board following up on a discussion which had occured at its March 28, 2018 School Board Meeting in which the Board discussed Kowal's email and request to accept the HRA Proposal. (ECF No. 59-3 at Exhibit 40). Kakabar gave the Board Members two options: (1) reinstate the HRA Proposal minus the five months for healthcare coverage Kowal received after he retired (Kakabar also proposed having Kowal pay Ferndale's attorney's fees and sign a document preventing Kowal from bringing suit with respect to unused sick days) or (2) pay Kowal the cash value of his remaining sick days. (*Id.*). The Board ultimately decided they would not reinstate the HRA Proposal. (ECF No. 46 at ¶ 155). Kakabar notified Kowal by correspondence on April 19, 2018, that the School Board would not be reinstating the HRA Proposal. (ECF No. 46-18). In that same letter, the Kakabar included a $22,213.71 check for the remaining value of Kowal's sick days, minus payroll deductions and the cost of his health insurance from October 2017 to February 2018. (ECF No. 46-18).

### G. Kowal Requests to Speak to the School Board Again

Between January 2018 and April 2018, Kowal did not attend a public School Board meeting, nor did he sign up to speak at any public comment portion of any public School Board meetings held between January 2018 and April 2018. (ECF No. 46 at ¶¶ 160-161).

On April 28, 2018, Kowal emailed School Board President Sandi Chobany ("Chobany") requesting that she facilitate sending a letter to the email addresses of all the members of the School Board. (*Id.* at ¶ 162). The letter Kowal requested Chobany share with the School Board reiterated his stance that he was wrongfully denied his post-retirement healthcare benefits and

repeated his request to meet with the Board. (ECF No. 46-21).  Chobany responded on May 3, 2018, indicating that she did not feel it was her place to provide Kowal the email addresses of the members of the School Board. (*Id.* at 8).  Further, Chobany informed Kowal that the Board would discuss his request to meet at their May 9, 2018, monthly Board Meeting, and a response to his request would be provided thereafter. (*Id.*).  Around the same time Kowal asked to meet with the School Board and have his letter shared with members of the School Board, Kowal also requested to meet with Kakabar to discuss the HRA Proposal. (*Id.*).

Following the May 19, 2018, School Board meeting, Kakabar emailed Kowal informing him that the Board had discussed both his request to meet with the Board as well as his request to meet with Kakabar. (ECF No. 59 at ¶ 164).  In that email, Kakabar notified Kowal that neither she nor the Board would meet with Kowal. (*Id.*).  Further, Kakabar stated that the Board was not interested in exploring any type of retirement incentive that included paid health coverage. (*Id.*).  Finally, Kowal was instructed that all future communication to "the District, Board Members, Superintendent, Business Manager, or any other school official should be sent to" Ferndale's attorney of record. (*Id.*).  Kowal then filed his second Charge of Discrimination with the EEOC and PHRC on June 18, 2018. (ECF No. 26 at ¶¶ 43-44).

## IV.    Procedural Background

On September 14, 2018, Kowal filed his Complaint bringing three claims against Ferndale: Discrimination in Violation of the ADEA (Count I), Discrimination in Violation of the PHRA (Count II), Breach of Contract (Count III). (ECF No. 1).  On November 19, 2018, Ferndale filed a Motion to Dismiss Pursuant to F.R.C.P. 12(B)(6) with an accompanying brief in support. (ECF Nos. 6, 7).  Kowal responded with a Brief in Opposition on December 11, 2018, (ECF No. 9), and

this Court entered a Memorandum Order on January 3, 2019 dismissing Counts II and III of Kowal's complaint without prejudice. (ECF No. 13).

Kowal then filed a First Amended Complaint on January 30, 2019, bringing two claims against Ferndale: Discrimination in Violation of the ADEA (Count I) and Wage Payment Collection Law (Count II). (ECF No. 16).  Ferndale filed a Motion to Dismiss and accompanying brief in support (ECF No. 18, 19).  On March 25, 2019, this Court entered a Memorandum Opinion and Order dismissing Count II of Kowal's Amended Complaint with prejudice. (ECF No. 22).

On April 4, 2019, Kowal filed a Second Amended Complaint bringing two claims against Ferndale: Discrimination Violation of the ADEA (Count I) and Retaliation in Violation of the PHRA (Count II). (ECF No. 26).  Ferndale answered Kowal's Second Amended Complaint on April 24, 2019. (ECF No. 29). Ferndale moved for summary judgment on March 22, 2021. (ECF No. 43).  Kowal responded in opposition on June 1, 2021 (ECF No. 55) and Ferndale replied on June 21, 2021 (ECF No. 60).

## V.     Legal Standard

This Court will grant summary judgment "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). There is a genuine issue of fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).  Material facts are those that affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248.  The Court's role is "not to

-14-

weigh the evidence or to determine the truth of the matter, but only to determine if the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009).   In deciding a summary judgment motion, this Court "'must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.  If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n.11 (1986)).  "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue").

## VI.    Discussion

Kowal alleges claims of retaliation against Ferndale under both the ADEA and PHRA.[10]

Kowal asserts that Ferndale retaliated against him because he filed a Charge of Discrimination

with the EEOC. (ECF No. 26 at ¶ 1). The ADEA makes it unlawful for an employer to discriminate

against an employee who has made a charge of discrimination against their employer under the

ADEA. 29 U.S.C. § 623(d).

It is undisputed that during the period of time relevant to this case, Defendant was an

"employer" subject to the ADEA's provisions.  29 U.S.C. § 630(b).  Further, neither party disputes

Kowal was an "employee" or "individual" entitled to statutory protection from retaliatory

discrimination under the ADEA.  (ECF Nos. 47, 55).  29 U.S.C. § 630(f). *See Erie Cnty. Retirees Ass'n*

*v. Cnty. Of Erie*, 220 F.3d 193, 209-210 (3d Cir. 2000) (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337,

341-345 (1997)).

Since this is a retaliation case in which Kowal has presented no "direct evidence" of

retaliation, the Supreme Court's framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), provide the

formulation for allocating the requisite burdens of proof and production for purposes of the

instant motion for summary judgment.[11]  In a retaliation case of this kind, the plaintiff must first

---

[10] Courts analyze claims under ADEA and PHRA in the same manner.  *See Kelly v. Drexel University,* 94 F.3d 102, 105 (3d Cir. 1996). The Court references only the ADEA framework for brevity—if Defendant is entitled to summary judgment on Plaintiff's ADEA claim, it is likewise entitled to summary judgment on Plaintiff's PHRA claims.

[11] The *McDonnell Douglas-Burdine* burden-shifting framework does not apply in an employment discrimination case in which a plaintiff presents "direct evidence" of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).  "Direct evidence" of discrimination is evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption" from the plaintiff's *prima facie* case to shift the applicable burden of production to the defendant. *Starceski v. Westinghouse Electric Corp.*,

establish a *prima facie* case of illegal retaliation. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff establishes a *prima facie* case of retaliation, the defendant must articulate legitimate, non-discriminatory reasons for treating the plaintiff in an adverse manner. *Id.* at 802–03. If the defendant articulates legitimate, non-discriminatory reasons for the plaintiff's adverse treatment, the plaintiff must demonstrate that the reasons given by the defendant for such treatment are merely a pretext for unlawful retaliation. *Id.* at 804–05.

### a. Kowal Cannot Show that Ferndale Retaliated Against Him for Engaging in Protected Activity

#### 1. The Parties' Arguments

Ferndale argues it did not retaliate against Kowal for engaging in protected activity. First, Ferndale contends that Kowal cannot establish a *prima facie* claim of retaliation because (a) he cannot demonstrate that he suffered an adverse action either subsequent to or contemporaneous to engaging in protected activity, and (b) he cannot establish that there was a causal connection between the protected activity he engaged in and the alleged adverse actions taken by Ferndale. (ECF No. 47 at 4).

More specifically, Ferndale argues Kowal cannot establish that he suffered an adverse action because (i) he was not entitled to post-retirement healthcare coverage under the Act 93 Agreement, (ii) Ferndale provided Kowal with fair compensation for his unused accumulated sick days, and (iii) Ferndale did not prevent Kowal from addressing the School Board in violation of Pennsylvania's Sunshine Act. (ECF No. 47 at 9-15). Further, Ferndale contends Kowal cannot establish there was a causal connection between the protected activity he engaged in and the

---

54 F.3d 1089, 1096 n.4 (3d Cir. 1995). The evidence presented in this case does not constitute "direct evidence" of discrimination.

alleged adverse actions taken by Ferndale because there is neither an unusually suggestive temporal proximity between the protected activity Kowal engaged in and Ferndale's alleged retaliatory acts, nor is there a pattern of antagonism coupled with the timing to establish a causal link between Kowal's activity and Ferndale's actions. (*Id.* at 15-25) (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

Ferndale also asserts that even if Kowal can establish a *prima facie* case of retaliation, Ferndale can show it had legitimate, non-discriminatory reasons for taking the actions it did. (ECF No. 47 at 25). Finally, Ferndale argues Kowal cannot show that the legitimate, non-discriminatory reasons for Ferndale's actions were pretextual because Kowal's protected activity did not motivate Ferndale to deny Kowal's requests to speak with the School Board, discontinue negotiations with respect to its HRA Proposal, or issue a check for Kowal's unused accumulated sick days. (*Id.* at 28-31).

Kowal contends the Ferndale retaliated against him for filing a Charge of Discrimination with the EEOC (ECF No. 26 at ¶ 1). Kowal argues he can establish a *prima facie* claim of retaliation because (a) he suffered an adverse action contemporaneous with and subsequent to his protected activity of filing a Charge of Discrimination with the EEOC and (b) there is a causal connection between his protected activity and Ferndale's adverse actions. (ECF No. 55). Kowal alleges he experienced adverse actions because (i) Ferndale repeatedly denied him the opportunity to address the School Board in violation of Pennsylvania's Sunshine Act, 65 Pa.C.S. § 701 *et seq.*, (ii) Ferndale stopped negotiations with respect to his post-retirement healthcare coverage, and (iii) Ferndale unilaterally mailed him a check for the value of his unused accumulated sick days in an amount significantly less than the amount to which he is entitled. (ECF No. 55). Further, Kowal

argues there is a causal connection between Ferndale's adverse actions and his protected activity because the adverse actions taken by Ferndale and the protected activity Kowal engaged in are closely linked in time. (*Id.* at 7).

Finally, Kowal argues he can demonstrate that the legitimate, non-discriminatory reasons articulated by Ferndale for taking the adverse actions against him are merely pretextual because there are several emails among Ferndale School Board members articulating their disappointment, distaste, and animus toward Kowal following his filing of a complaint with the EEOC. (*Id.*).

### 2. Kowal Cannot Establish a *Prima Facie* Case of Retaliation Under the ADEA

To establish a *prima facie* case of proscribed retaliation under either the ADEA or the PHRA, the plaintiff must show that: (1) he engaged in a protected employee activity; (2) he was subject to adverse action by the employer either subsequent to or contemporaneous with the protected activity; and (3) that there is a causal connection between the protected activity and the adverse action. *Fasold v. Justice*, 409 F.3d 178, 188 (3d. Cir. 2005) (citing *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002).

Here, it is undisputed that Kowal engaged in protected employee activity by filing his Charge of Discrimination with the EEOC. (ECF No. 47 at 4). Therefore, the Court must only determine whether (A) Kowal was subject to an adverse action by Ferndale and (B) whether Kowal has demonstrated a causal connection between filing his EEOC Complaint and the adverse actions taken by Ferndale.

### A. Kowal Was Not Subject to an Adverse Action

Kowal alleges three adverse actions taken by Ferndale including (i) declining Kowal's requests to meet with the School Board, (ii) refusing to continue negotiations with respect to its HRA Proposal and other post-retirement healthcare coverage, and (iii) unilaterally mailing him a check for the value of his unused accumulated sick days in an amount significantly less than the amount to which he is entitled. (ECF No. 26 at ¶¶ 32-34, 39-42, 51).

"For an employer's action to satisfy the second prong of a *prima facie* case of retaliation, the plaintiff 'must show that a reasonable employee would have found the challenged action materially adverse,' which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Daniels v. School Dist. of Philadelphia*, 776 F.3d 181, 195-196 (3d Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). The Court is to analyze the employer's alleged adverse action "from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 71 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998). "[P]etty slights, minor annoyances, and simple lack of good manners" generally will not suffice. *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 71 at 68. However, "[c]ontext matters" such that "an act that would be immaterial in some situations is material in others." *Id.* at 69, (quoting *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir.2005) (internal quotation marks omitted)). The Court will address each of Ferndale's alleged adverse actions in turn.

First, Kowal alleges that the School Board took materially adverse action against him by declining to meet with him. (ECF Nos. 26 at ¶ 31-35; 46-3 at Exhibit 4; 59 at ¶ 164). Kowal's argument hinges on the fact that Kakabar informed him that the School Board was declining to

meet with him at its scheduled public School Board meeting on January 17, 2018. (ECF No. 46-3 at Exhibit 4). However, despite the School Board declining to meet with Kowal at its scheduled public meeting on January 17, 2018, nothing in the record indicates that Kowal was prohibited from attending the January 17, 2018 meeting. (ECF Nos. 46-13; 46-1 at 148: 9-24; 46-1 at 149: 1-24; 46-1 at 151:11-18; 57-2 at 32-33). Nothing in the record indicates Kowal was prevented from speaking during the public comment period of the January 17, 2018 meeting. (*Id.*). Furthermore, nothing in the record indicates that Kowal was prohibited from attending any publicly held School Board meeting and/or speaking during any public comment period of any publicly held School Board meeting from the time of his initial meeting request on December 19, 2017, through April 2018. (*Id.*). Indeed, even though Kowal specifically asked the School Board to meet in an "open meeting," he never attended *any* publicly held School Board meeting from the time of his initial meeting request through April 2018. (*Id.*). No reasonable person in Kowal's position could view the School Board declining a meeting request as a materially adverse action when any person, including Kowal, could have attended any publicly held School Board meeting and/or spoken during any public comment portion of any publicly held School Board meeting. *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 71. Here, the Court finds that the School Board declining to meet with Kowal does not constitute an adverse action for the purpose of establishing a *prima facie* claim of retaliation.

Second, Kowal argues that Ferndale's refusal to continue negotiations regarding its HRA Proposal and other post-retirement healthcare benefits constitutes a materially adverse action against him. (ECF No. 55 at 5-7). As an initial matter, nothing in the factual record indicates that the HRA Proposal was open for further negotiation following Kakabar's December 18, 2017 email.

(ECF No. 46-12 at 3).  Following Kakabar's email stating that "final revisions" had been made to the HRA Proposal, Kowal did not communicate any additional terms he wanted incorporated into the HRA Proposal, nor did he raise any concerns with Kakabar that she had failed to incorporate changes he had previously requested. (ECF Nos. 46 at ¶ 141; 59 at ¶ 141).  Further, in response to Kowal's email informing Ferndale of his contact with the EEOC, Ferndale postponed the expiration date of the HRA Proposal until February 15, 2018. (ECF No. 46-3 at Exhibit 4).  Even after Ferndale extended the HRA Proposal deadline—a deadline set before Kowal engaged in protected activity—Kowal did not accept or respond to Ferndale's HRA Proposal by the deadline of February 15, 2018. (ECF Nos. 46 at ¶ 133; 59 at ¶ 133).  Indeed, Kowal's only communication with respect to the HRA Proposal was to request that the HRA Proposal be reinstated more than a month after it had expired. (ECF No. 46-19).   Moreover, nothing in the factual record indicates any other offers or negotiations for post-retirement healthcare coverage were made between Kowal and Ferndale.  No reasonable person in Kowal's position could conclude that Ferndale's extension of a deadline to accept the HRA Proposal—a deadline set before Kowal engaged in protected activity—and Ferndale's subsequent refusal to reinstate the HRA Proposal more than a month after it expired establishes a materially adverse action.  The Court finds that Ferndale's refusal to reinstate the HRA Proposal and/or negotiate other post-retirement healthcare coverage negotiations does not constitute an adverse action against Kowal.

Third, Kowal contends that Ferndale unilaterally mailing him a check for the value of his unused accumulated sick days in an amount significantly less than the amount to which he feels he is entitled is an adverse action. (ECF No. 55 at 5-7).  Kowal was ineligible to participate in the Sick Leave Incentive Program, and, as such, was not entitled to sick day benefits at the time he

retired. (ECF Nos. 26 at ¶ 8; 46-2 at Exhibits D-6, D-7; 59 at ¶ 41). Although the School Board granted a waiver of Kowal's Act 93 Agreement, the Board's waiver was no longer valid because Kowal did not accept the HRA Proposal by the deadline of February 15, 2018. (ECF No. 46-3 at Exhibit 2). Notwithstanding Kowal's failure to respond by the February 15, 2018 deadline, Ferndale paid Kowal for the value of his unused accumulated sick days at the Act 93 rate of $115 per day (less his months of post-retirement healthcare coverage and payroll withholdings). (*Id.*). No reasonable person in Kowal's position could conclude that receiving a cash payment for a benefit he or she was not entitled to, at a rate he or she was not entitled to, constitutes a materially adverse action. The Court finds that Ferndale unilaterally mailing a check to Kowal for the value of his unused accumulated sick days is not a materially adverse action for the purposes of establishing a *prima facie* claim of retaliation against Ferndale.

In sum, none of the actions taken by Ferndale constitute a materially adverse employment action for the purpose of establishing a *prima facie* case of retaliation. Nevertheless, even if Ferndale's actions qualified as such, Kowal fails to fully establish the third element of a *prima facie* case of retaliation as discussed in the next section.

### B. Kowal Can Partially Demonstrate a Causal Connection Between Ferndale's Alleged Adverse Actions and His Engagement in Protected Activity

Assuming *arguendo* Kowal can establish he was subject to adverse actions by Ferndale, he can only partially demonstrate a causal connection between Ferndale's alleged adverse actions and his EEOC activity. "To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a

causal link. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).  The Court "consider[s] a 'broad array of evidence' in determining whether a sufficient causal links exists [for a plaintiff] to survive a motion for summary judgment." *Daniels v. School Dist. of Philadelphia*, 776 F.3d 181, 195-196 (3d Cir. 2015) (quoting *LeBoon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007).

First, Kowal contends that his filing a Charge of Discrimination with the EEOC caused Ferndale to deny his meeting requests with the School Board.  (ECF No. 55 at 5-7).  Here, Kowal can show a causal connection between the Board's refusal to allow him to meet with the School Board and his protected activity of filing a Charge of Discrimination with the EEOC.  Specifically, in her email to Kowal in response to his request to meet with the School Board, Kakabar informed Kowal that the School Board would not meet with Kowal because (1) Kowal had placed himself on Ferndale's insurance without having spoken with Kakabar or Walsh before retiring, (2) Kowal was instituting legal proceedings against Ferndale, (3) *Kowal indicated he had an initial interview with the EEOC to determine if other fair employment laws had been violated,* and (4) Kowal informed Ferndale it may be necessary for them to secure an attorney. (ECF No. 46-3 at Exhibit 4) (emphasis added).  Ferndale clearly indicates that, among several reasons, Kowal's contact with the EEOC was a factor in the Board's decision to decline Kowal's meeting request. (*Id.*). Notwithstanding the causal connection between Kowal's protected activity and the School Board declining his meeting requests, for the reasons stated in Section VI(a)(2)(A), the Court has determined that Kowal cannot establish that Ferndale took materially adverse action against him by declining his meeting requests. *Supra* Section VI(a)(2)(A).  The School Board declining to meet with Kowal had no impact on Kowal's ability to attend a publicly held School Board meeting and discuss his Sick

Leave Incentive Program status with the School Board. *Id.* Because Kowal cannot demonstrate School Board took a materially adverse action against him by declining to meet with him, he fails to establish a *prima facie* claim of retaliation against Ferndale.

Second, Kowal argues that his activity with the EEOC caused Ferndale's refusal to continue negotiations regarding its HRA Proposal and other post-retirement healthcare benefits. (ECF No. 55 at 5-7). Ferndale set December 20, 2017, as the deadline for Kowal to accept the HRA Proposal which was prior to Kowal engaging in protected activity. *Supra* Section VI(a)(2)(A). Upon learning of Kowal's protected activity, Ferndale extended the deadline for Kowal to accept the HRA Proposal until February 15, 2018. *Id.* The only activity caused by Kowal engaging in protected activity was an extension of a deadline already established before Kowal had engaged in protected activity with the EEOC. (ECF No. 46-3 at Exhibit 5). Kowal has failed to demonstrate any causal link between Ferndale's refusal to continue the HRA Proposal and other post-retirement healthcare negotiations and his protected activity with the EEOC for the purpose of establishing a *prima facie* claim of retaliation.

Third, Kowal contends that his protected activity with EEOC caused Ferndale to unilaterally mail him a check for the value of his unused accumulated sick days in an amount significantly less than the amount to which he feels he is entitled. (ECF No. 55 at 5-7). Again, as discussed above, Kowal was ineligible to participate in the Sick Leave Incentive Program and was not entitled to sick day benefits at the time he retired. *Supra* Section VI(a)(2)(A). Following Kowal's failure to respond by the February 15, 2018 deadline, Ferndale paid Kowal for the value of his unused accumulated sick days at the Act 93 rate of $115 per day (less his months of post-retirement healthcare coverage and payroll withholdings). *Id.* The Court finds there is no

unusually suggestive temporal proximity between Kowal's protected EEOC activity on December 18, 2017, and Ferndale issuing Kowal a check for his unused accumulated sick days on March 5, 2018. *DeFlaminis*, 480 F.3d at 267. Further, Kowal cannot demonstrate a pattern of antagonism, coupled with timing, that would establish a causal link between the date he received his sick day payment and the date he filed a Charge of Discrimination with the EEOC. *Id.* The Court holds that Kowal cannot establish any causal link exists between Ferndale issuing him a check for the value of his sick days and his protected activity with the EEOC for the purposes of establishing a *prima facie* claim of retaliation, especially since he was not eligible for participation in the Sick Leave Incentive Program.

In sum, Kowal has failed to establish a *prima facie* claim of retaliation against Ferndale. However, even if Kowal had established a *prima facie* claim of retaliation against Ferndale, the Court would still grant Ferndale's motion for summary judgment because Ferndale has met their burden of offering legitimate, non-retaliatory reasons for the adverse employment actions taken against Kowal and Kowal has failed to rebut those reasons.

### 3. Ferndale Has Put Forth Evidence that Permits a Jury to Find that it Took Adverse Actions Against Kowal for Legitimate, Non-retaliatory Reasons

Assuming *arguendo* Kowal can establish a *prima facie* claim of retaliation against Ferndale, the burden of production shifts to Ferndale to introduce admissible evidence that, if taken as true, would permit a finding that the challenged employment actions were taken for legitimate, non-retaliatory reasons. *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006).

The Court holds that Ferndale has produced evidence that shows it denied a School Board meeting with Kowal, refused further HRA Proposal and other post-retirement healthcare benefit

negotiations with Kowal, and paid Kowal the actual value of his unused accumulated sick days for legitimate, non-retaliatory reasons.  A jury could find that Kowal experienced these adverse actions because: (1) Kowal was not entitled to an executive session meeting with the School Board, (2) Kowal could have attended any publicly held School Board meeting between December 2017 and April 2018, (3) Kowal could have spoken to the School Board during any public comment period of any publicly held School Board meeting, (4) Kowal failed to meet all prerequisites to be eligible to participate in the Sick Leave Incentive Program, (5) Kowal failed to accept Ferndale's HRA Proposal by the deadline of February 15, 2018 and did not request any extensions to the deadline, (6) Kowal did not request further changes be made to the HRA Proposal or negotiate any other post-retirement healthcare benefits, and (7) Kowal was paid the actual value of his unused accumulated sick days minus the cost of his healthcare coverage and payroll deductions at the Act 93 rate.

Accordingly, Ferndale has satisfied its burden of production to show that it took adverse actions against Kowal for non-retaliatory reasons.

### 4. Kowal Cannot Show that Ferndale's Reasons for its Adverse Actions Against Him Are Pretextual

Given that Ferndale has met its burden under *McDonnell Douglas*, the burden shifts back to Kowal to show that Ferndale's stated reasons are a pretext for retaliation. Kowal must show pretext by pointing to some evidence which: "(1) casts sufficient doubt upon each of the legitimate reasons proffered by [Ferndale] so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes v. Perskie*, 32

F.3d 759, 764 (3d Cir. 1994). Kowal has failed to demonstrate pretext under both prongs of *Fuentes*. (ECF No. 55 at 7). Indeed, the only evidence produced by Kowal to rebut Ferndale's legitimate, non-retaliatory proffered reasons are two email chains—one occurring after the HRA Proposal initial deadline expired on December 21, 2017, and the other email chain occurring after Kowal requested the HRA Proposal be reinstated in March 2018. (ECF No. 59 at ¶ 155). Neither email chain produced by Kowal demonstrate fabrication, much less that Kowal's EEOC activity was more likely than not a motivating cause for Ferndale's adverse employment actions against him. Kowal has failed to establish that Ferndale's legitimate, non-retaliatory reasons are a pretext for retaliatory conduct.

## VII. Conclusion

For the forgoing reasons, the Court grants Defendants' Motion for Summary Judgment. (ECF No. 45). An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN KOWAL, | ) | Case No. 3:18-cv-181 |
| | ) | |
| Plaintiff, | ) | JUDGE KIM R. GIBSON |
| | ) | |
| v. | ) | |
| | ) | |
| FERNDALE AREA SCHOOL DISTRICT | ) | |
| and FERNDALE AREA SCHOOL | ) | |
| DISTRICT BOARD OF EDUCATION, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

NOW, this 29th day of November, 2021, upon consideration of Defendants' Motion for Summary Judgment (ECF No. 45), and for the reasons set forth in the accompanying Memorandum Opinion, it is **HEREBY ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 45) is **GRANTED**.

BY THE COURT:

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE